## Hardy v. Myers.

### (Decided January 13, 1925.)

### Appeal from Perry Circuit Court.

1. Master and Servant—Evidence 'Held. Not to Warrant Judgment Enforcing Alleged ·Agreement to Divide Corporate Stock.—Evidence held not to sustain judgment enforcing· alleged, agreement to divide with plaintiff, as compensation for services, certain shares of mining stock, especially where defendant's right to such shares could not accrue under his contract with company until the corporation was in position to pay its debts.

2. Master and Servant—Contract Indefinite as to Duration Terminable at Will.—Contracts must be mutual, and a contract for personal services not definite as to duration is terminable by either party at will.

3. Partnership—Contract Indefinite as to Duration Terminable at Will of Either Party.—A contract of partnership which does not specify duration is terminable by either party at will.

4. Master and Servant—Contract Between Superintendent and Manager Held Not to Entitle Former to Share Proceeds of Latter's Contract.—Contract between general manager and mine superintendent, for latter's services, entitling him to specified sums of money and certain stock privileges, held one of employment, with no duration fixed, on termination of which superintendent was not entitled to share the fruits of general manager's contract with company.

SAMUEL M. WILSON and JESSE MORGAN for appellants.

P. T. WHEELER and FAULKNER, STANFILL & FAULKNER for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming on cross-appeal, reversing on original appeal.

In the year 1916 the Andrews Steel Company and the
Newport Rolling Mills had difficulty in getting coal to
keep their furnaces running.   The Burlingham Coal
Company was a corporation selling coal.   The three com-
panies conceived the idea of opening a coal plant which
they could control.   With this view they began negotia-
tions with Paul Hardy, an experienced mining engineer,
to have the benefit of his skill in selecting the property
and in the necessary arrangements to be made to open a
plant.   After the matter had been talked over for some
months and the Andrews Steel Company had agreed to
furnish the capital necessary to open a coal plant, they
agreed upon taking a five thousand acre tract in Perry
county and developing it, assurances having been first
secured from the Louisville and Nashville Railroad Com-
pany that it would extend its line out to the plant, a dis-
tance of seven or eight miles.

On February 16, 1917, the Kentucky River Coal Cor-
poration in writing offered to lease to P. H. Burlingham,
trustee, the property referred to, for a royalty of ten
cents a ton, but not to fall below a certain minimum.   The
proposition was conditioned upon the stipulation that a
corporation should be formed within a reasonable time
with a capital stock of $300,000.00, the lease to be made
in the name of the corporation.   Burlingham, trustee, on
that day in writing accepted the proposition for himself
and his associates.

On March 10, 1917, a written agreement was entered
into between the Burlingham Coal Company, acting in
behalf of itself, and of the Hardy-Burlingham Mining
Company, a corporation about to be organized, of the
first part and the Andrews Steel Company of the second
part.   By this writing the Andrews Steel Company
agreed to advance the necessary capital up to $300,000.00
for the purpose of developing the property secured by
the contract of February 16th.   It was stipulated that a
corporation should be organized under the name of the
Hardy-Burlingham Mining Company, with a capital stock
of $300,000.00, consisting of three thousand shares, and
that the company should issue $500,000.00 of twenty year
gold bonds, bearing interest at six per cent.   The An-

drews Company obligated itself to purchase at par the
bonds and thus furnish the money to develop the coal
lands.    The coal company obligated itself, immediately
upon the organization of the mining company, to trans-
fer and assign to it the contract of February 16th.    In
consideration of this assignment and the other services
rendered by them, the entire stock of the mining company
immediately upon its organization was to be issued as
fully paid up, one-half to the Andrews Steel Company
and one-half to the coal company.    All the coal produced
was to be sold on certain terms to the Andrews Steel
Company or the Newport Rolling Mills.    It was stipu-
lated in the writing that the mining company should be
managed by six directors, three named by the Andrews
Steel Company and three named by the Burlingham Coal
Company, one of whom was Paul Hardy, who had been
agreed upon as the general manager of the mining com-
pany.    The eighth clause of the contract was in these
words:

> "A fixed charge of three cents per ton for the
> supervision of the operation and development of the
> property is to be set aside by said Hardy-Burling-
> ham Mining Company on or before the 25th of each
> month for all coal mined during the preceding month
> and this charge of three cents per ton is to be in-
> cluded in the cost of production.    This fund is to be
> paid to the general manager in lieu of salary, or to
> the general manager, superintendent, or other em-
> ployees of the Hardy-Burlingham Mining Company.
> It is further agreed that the maximum amount to be
> retained by the general manager in any one year
> for his own personal benefit is to be twelve thousand
> ($12,000.00)    dollars.    Any    excess    amount    over
> $12,000.00 is to be distributed subject to the approval
> of the board of directors or put into the treasury of
> the Hardy-Burlingham Mining Company."

On March 29, 1917, P. H. Burlingham, Paul Hardy
and William Burlingham filed in Delaware their certifi-
cates of incorporation of the Hardy-Burlingham Coal
Company.    Before this, however, it had been agreed be-
tween the Burlinghams and Hardy that he was to have
one-half the stock which was to be issued to them under
the contract of March 10th.    But it had further been
agreed between all the parties that none of this stock was

to go out of the control of the Andrews Steel Company until the bonds above referred to were paid off. After the company was incorporated the stock was issued but left in the hands of the Andrews Steel Company, Hardy, pursuant to the original agreement, signing on the back of his certificates a blank transfer, such as is usually made in such cases. The stock with this transfer written upon it has since remained in the hands of the Andrews Steel Company. The bonds have not been paid off, in fact the debt has been increased to something over a million dollars, and under the original agreement the stock is not to be delivered until the debt is paid.

Paul Hardy and Fred Myers were schoolmates, they had kept up their intimacy for years. Myers had had a number of years' experience as a mining engineer and as superintendent of coal mines. In December, 1916, Hardy saw Myers and told him of the proposition he then had in hand, suggesting that he go in with him on it. During the Christmas holidays Myers took dinner at Hardy's house with his wife and there the subject was talked over further. Later in January they met and again talked the matter over and Myers says he there agreed to go in with Hardy to share equally what he was to get out of the transaction, Hardy telling him that he could not go and stay on the ground as he had other matters he must look to and he wanted Myers to take charge of the property and develop it on these terms. Some weeks later Hardy wrote to Myers and had him to go with him to Perry county to look over the property. They went there and looked over it. Myers was present when the contract of February 16th was drawn, and according to the testimony of a witness he was then held out by Hardy as a person who was interested in the proposition. About April 1st the railroad company set its engineers to work surveying the route for the railway and on April 1st Myers went to work to put in the plant. He was given the position of superintendent by Hardy, who was the general manager. After he had been at work about two weeks it was agreed between him and Hardy that the company would pay him $300.00 a month as superintendent, and he was so paid regularly.

They began delivering coal in March or April, 1919. Hardy lived at Huntington, West Virginia, Myers lived

at the mine.    The following correspondence passed between them after this:

"Huntington, W. Va., June 2, 1919.

"Mr. Fred Myers,
c/o Hardy-Burlingham Mining Co.,
Hazard, Kentucky.

"Dear Fred:

"This is to advise that the Paul Hardy, trustee account which cover coal through the month of April, is now $726.57, of which your proportion is $290.63.

"Yours very truly,

"PAUL HARDY."

"Huntington, W. Va., Oct. 6, 1919.

"Mr. Fred Myers,
Louisville, Ohio.

"My Dear Fred:

"Prentice Burlingham and myself were at the mines last week and it has been decided that we must make a change in the supervision of the Hardy-Burlingham Mining Company, consequently I will be glad if you will send us your resignation to take effect September 30th.    It is needless to say that this change is not due to any shirking or responsibility on your part, as we both feel that you have given the property your best efforts, but we do feel that from now on the operating must be in a more systematic manner.

"The prospects that I have always held out for you as to profit sharing, etc., is a matter of which you and I will have to decide ourselves, as I think your work entitles you to a great deal of consideration.    At any rate your proportion of the three cent bonus will be sent you each month, at least until the first of the coming year.    Your proportion already in the bank, which covers tonnage up to September 1st, amounts to $1,030.42.

"I hope that you will take this change in the light that there is absolutely nothing personal involved and that it has been made after most careful consideration.

"Sincerely yours,

"PAUL HARDY, G. M."

"Louisville, Ohio,
10/9/19.

"Mr. Paul Hardy,
Huntington, W. Va.

"Dear P. H.:

"Of course I was somewhat surprised when your letter was received. I had thought that possibly there might have been some question of my loyalty, on which you have always been very insistent. Didn't think there would be any question as to geting a chance at it when the present proposed new houses were finished; the mines have always been one year ahead of the dwellings. However, don't see any gain along this line. You knew as well as myself the exact conditions. Want to ask if it is possible for you to mail me a check for amount due me through bonus. R. V. and myself built a house here which cost $8,500.00, not as an investment but as a home for our mother; the old house was a woman killer. This put a crimp in my finances. Still have a note in Jim Roan's bank for $1,500.00. I owe H. B. Mining Co. about $1,150.00. $500.00 for Liberty Bonds; $300.00 store and $350.00 advance on this trip. Hadn't figured on going away this fall. Thought probably my bonus for Sept., Oct., Nov. and Dec. might square this latter account. I had passed up all other deals when coming to Kentucky. Had figured getting in on the common stock, or stock when plant paid for itself.

"Will go down to Hardburly some time this month and move my junk out. Should it be found necessary to use the house before I come down the furniture can be moved to some other place.

"Will see you should you be down while I am there.

"Yours, etc.,

"F. MYERS."

"Huntington, W. Va.,
Oct. 11, 1919.

"Mr. Fred Myers,
Louisville, Ohio.

"My dear Fred:

"I am enclosing with this cashier's check for $1,030.42, which is your bonus up to September 1st.

"There is no use of my going into details through the mail but will arrange to see you when you are either going through Huntington or at the mines.

"With kindest regards, I am,

"Very truly yours,
"PAUL HARDY."

"Hazard, Kentucky, 11/28/19.

"Mr. Paul Hardy,
Huntington, W. Va.

"My dear P. H.:

"Expect to leave here for Penn. Friday and wish you would write me at 1034 Church St., Indiana, Pa. We have been associated more or less closely for past 10 years and I have always had absolute confidence in everything you had offered or agreed to share with me. I feel sure at the time you agreed to split 50-50 with me on the Hardburly proposition you fully intended to do so. The only witness to the deal as I remember was Mrs. Myers and I remember that Mrs. Hardy was present also. Considering that I passed up absolutely everything else and gave the Hardy-Burlingham all my attention while you fellows were free to dig up something else, there should be no question as to my claim. I had several chances to go into the game for myself in a smaller way but passed them up to take your proposition. You probably did not know it but I did have a one-third interest in a small mine in Ohio but sold interest for a small amount because I could give it no attention.

"Hoping you will give the above your consideration, I remain,

"Sincerely yours,
FRED MYERS."

Efforts to obtain a settlement with Hardy having failed, Myers on January 21, 1920, brought this action

against Hardy alleging, in substance, that Hardy under his contract with the Burlingham Coal Company was to receive one-half of the $150,000.00 of stock issued to it in the Hardy-Burlingham Mining Company and was also to receive as general manager three cents per ton on all the coal produced, and that Hardy agreed with him to divide with him equally what he would thus receive if he would go in with him and that he had accepted the proposition and worked under it as above stated. An answer was filed controverting the allegations of the petition, proof was taken and on final hearing the court entered judgment adjudging to Myers $37,500.00 of the stock of the Hardy-Burlingham Mining Company and ordering that the stock be issued to him by the corporation, which was also one of the defendants to the action. The court further adjudged that Myers take nothing further from the fund arising from the three cents per ton set apart to Paul Hardy under the promotion contract or otherwise. From this judgment the defendants appeal and Myers prosecutes a cross-appeal.

Myers testifies that Hardy told him of the proposition he had from his associates as to the stock and as to the three cents per ton and offered to divide with him equally if he would go on the ground and take charge of the work and that this he did; that when he went there to take charge of the work he suggested to Hardy that it would take two years before they would deliver coal and that he must have a salary during this time; that they talked the matter over and agreed on $300.00 a month; that two weeks later when Hardy returned he told him that it was arranged that the company would pay him the $300.00 a month. He had then been at work two weeks and he says that it was agreed that he was to have in addition to the $300.00 one-half of what Hardy was to get under his contract. He also testifies that later when C. W. Snyder, another engineer, was employed it was agreed between him and Hardy that Snyder was to have twenty per cent of the three cents a ton and the remainder to be divided between him and Hardy, and that for this reason he was in fact paid only forty per cent of the three cents a ton.

On the other hand Hardy denies making any contract with Myers in regard to the stock and denies agreeing to pay him one-half of the three cents per ton or making any agreement with him about how much was to be paid Snyder, and says that he made the division as general

manager and that Myers acquiesced in it. He also says Snyder was employed to build tipples, a work for which a man peculiarly qualified was demanded and that Myers was discharged because he was slipshod in his methods as superintendent and by reason of his mismanagement the corporation was losing money and a change had to be made. Hardy received no pay until the coal was sold.

The forty per cent coming to Myers up to January 1, 1920, was applied by Hardy on the debt which Myers owed the company as indicated in his letter above quoted and amounted to something over a thousand dollars:

Under any view of the evidence the judgment in favor of Myers as to the stock is erroneous. Hardy, under the contract he made with his associates, was entitled to have no stock issued and delivered to him until the debts of the corporation were all paid, and in any view of the evidence, Myers was entitled to no right which Hardy did not have.

Hardy's testimony that he did not agree with Myers that he was to have half his stock in the corporation is supported not only by the fact that such an agreement by Hardy would have been in violation of his agreement with his associates, but it is also supported by the subsequent conduct of both the parties. Although Myers worked there for two years he took no steps to learn what was the agreement between Hardy and his associates. He never saw the written contract or asked to see it and first learned what the agreement was when the depositions were taken in this case. He for two years made no demand for stock or asserted any right to it. In all the talk between them during this two years, where the words of the conversation are given, the thing in mind seems to have been the three cents a ton on the coal. It is agreed that it will take fifty years to exhaust the coal and that the present debt of over a million dollars will not be paid in many years. The stock has little essential value except as giving the holder power to destroy the equilibrium of stock control, devised when the corporation was organized. To destroy this would be to defeat the essence of the agreement and would have involved a grave breach of trust on the part of Hardy to his associates. There is nothing in his subsequent conduct or his letters indicating that he did this. We therefore conclude that Myers was not entitled to one-half the stock standing in Hardy's name and that the court should have so adjudged.

The cross-appeal involving Myers' rights in the fund arising from the three cents a ton on the coal presents a different question. Hardy's letters, his conduct and his expressions, shown by the evidence, confirm Myers' testimony that Myers was to share this fund with him, but Myers received $300.00 a month the whole time he was serving and he also received his share of the three cent fund from the time they began shipping coal. He did not go in with Hardy on a 50-50 basis, for he got $300.00 a month while Hardy received nothing, although Hardy superintended the work and was at the plant from time to time attending to things. Myers was getting $250.00 a month when he accepted Hardy's offer and this acceptance became final when it was agreed that he was to have $300.00 a month from the company. If this agreement had not been made about the middle of April he could have quit without liability to Hardy or the company, for no definite period of service had been agreed on. He had the same right in September, 1919, and if he had then received an offer of $1,000.00 a month elsewhere and had accepted it and gone to it, neither Hardy nor the mining company could have complained.

Contracts must be mutual. If a contract for personal services is not definite as to duration it is terminable by either party at pleasure. 18 R. C. L. 508. The same rule applies to a partnership where no time is specified for its continuance. 20 R. C. L. 953.

The three cents fund was to continue as long as they were getting out coal, and it was estimated that the coal would not be all gotten out for fifty years. Neither Hardy nor Myers could reasonably have contemplated that their contract was to run for fifty years, for both of them were men in middle life and neither of them could reasonably expect to be in active business that long. Hardy would only receive the three cents while he continued as general manager. No time was fixed as his term and he could be removed by the corporation at any time. The three cents fund was to be paid to the general manager, not Hardy personally.

Under all the circumstances the court concludes that the contract of Hardy with Myers was a contract of employment, indefinite in duration, and that he was to receive his share of the three cents while the employment continued. The continuance of the employment was subject to the pleasure of the company. It was conditioned upon his discharging the duties of the place in a manner

satisfactory to the company, and he has no legal cause
of complaint that the company, finding his business
methods slipshod, terminated the employment.  He must
have understood from the beginning that his employment
would certainly end before the coal was exhausted, and
if he desired to guard against a premature discharge it
was incumbent upon him to contract for a definite term.
It is reasonable that if the parties had contemplated a
definite contract, lasting through the remainder of their
lives, they would have put their agreement in writing.

The judgment on the cross-appeal is affirmed.  On
the original appeal the judgment is reversed with direc-
tions to dismiss the petition.  The whole court sitting.